127 F.Supp.2d 1181 (2000)
William D. JOHNSON et al., Plaintiffs,
v.
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS, The City of Kansas City, Kansas, and The Housing Authority of Kansas City, Kansas, Defendants.
Sophia Barajas et al., Plaintiffs,
v.
Unified Government of Wyandotte County/Kansas City, Kansas, The City of Kansas City, Kansas, and The Housing Authority of Kansas City, Kansas, Defendants.
Nos. 99-2407-JWL, 99-2448-JWL.
United States District Court, D. Kansas.
December 21, 2000.
*1182 Steve A.J. Bukaty, Lawrence G. Rebman, Steve A.J. Bukaty, Chtd., Overland Park, KS, for plaintiffs.
Daniel B. Denk, Gregory P. Goheen, McAnany, Van Cleave & Phillips, Kansas City, KS, LesLee Huttie, McDowell, Rice, Smith & Gaar, Kansas City, MO, for Unified Government of Wyandotte County/Kansas City, City of Kansas, Kansas Police Dept.
Kathryn Pruessner Peters, McDowell, Rice, Smith & Gaar, Overland Park, KS, Thomas R. Buchanan, LesLee Huttie, *1183 McDowell, Rice, Smith & Gaar, Kansas City, MO, for Housing Authority of Kansas City.

MEMORANDUM AND ORDER
LUNGSTRUM, District Judge.
The plaintiffs in these consolidated cases are police officers commissioned by the Kansas City, Kansas Police Department who have brought this action seeking overtime compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq. Presently before the court are motions for summary judgment by defendant Housing Authority of Kansas City, Kansas (Doc. 69) and defendant Unified Government of Wyandotte County/Kansas City, Kansas (Doc. 78). For the reasons set forth in detail below, both motions are denied.

 Background[1]
Plaintiffs are full-time police officers employed by the Kansas City, Kansas Police Department ("KCKPD"), which is a sub-unit of defendant Unified Government of Wyandotte County/Kansas City, Kansas ("Unified Government"). At some point after October 1, 1996, each of the plaintiffs agreed to work during his or her off-duty hours as a security officer at certain public housing complexes located within the Kansas City, Kansas corporate city limits and managed by the Kansas City, Kansas Housing Authority ("Housing Authority").
Each of the officers participating in the Housing Authority security program are required to wear their KCKPD-sanctioned uniforms, to report to and maintain contact with the KCKPD police dispatcher, and to observe the code of police conduct established by the KCKPD. The hours spent per week performing Housing Authority-related patrol varies from plaintiff to plaintiff. Plaintiffs are compensated at a regular hourly rate for providing security in the areas maintained by the Housing Authority, and are paid directly by the Housing Authority for their services. The hours plaintiffs accumulated during Housing Authority patrol were not combined for overtime compensation purposes with those spent performing their ordinary police duties.
Plaintiffs filed these two actions in September 1999, claiming that, for purposes of calculating the amount of overtime compensation to which they are entitled under the FLSA,[2] plaintiffs are allowed to consolidate those hours spent providing security at Housing Authority facilities with those accumulated while on-duty at the KCKPD. Defendants move for summary judgment on the ground that the hours accumulated during the Housing Authority patrol are exempted from the FLSA's overtime compensation requirements by the "special detail" exemption of 29 U.S.C. § 207(p)(1).[3] *1184 In pertinent part, 29 U.S.C. § 207(p)(1) provides:
If an individual who is employed by a State, political subdivision of a State, or an interstate governmental agency in fire protection or law enforcement activities ... and who, solely at such individual's option, agrees to be employed on a special detail by a separate or independent employer in ... law enforcement, or related activities, the hours such individual was employed by such separate and independent employer shall be excluded by the public agency employing such individual in the calculation of the hours for which the employee is entitled to overtime compensation under this section if the public agency 
(A) requires that its employees engaged in fire protection, law enforcement, or security activities be hired by a separate and independent employer to perform the special detail,
(B) facilitates the employment of such employees by a separate and independent employer, or
(C) otherwise affects the condition of employment of such employees by a separate and independent employer.
29 U.S.C. § 207(p)(1).
The above exemption is also the ground on which defendants initially moved for dismissal, or alternatively, for summary judgment, in October 1999. The court denied defendants' previous motion because defendants "failed to establish that no material issues of fact remain for trial." Barajas v. Unified Government, 87 F.Supp.2d 1201, 1209 (D.Kan.2000); Johnson v. Unified Government, 2000 WL 278114, at *1 (D.Kan. Feb.17, 2000). In their current motions for summary judgment, defendants attempt to address this shortcoming and ask the court to reexamine the applicability of the special detail exemption.
The parties have thoroughly presented their positions on summary judgment in voluminous briefs filed with the court. Moreover, the parties clarified their summary judgment arguments at a motion hearing held by the court on December 8, 2000. After carefully considering both their written and oral arguments, the court is now prepared to rule.

 Legal Standards
The Supreme Court has held that exemptions to the FLSA must "be narrowly construed against ... employers and are to be withheld except as to persons plainly and unmistakably within their terms and spirit." Auer v. Robbins, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (internal quotation and citation omitted). As plaintiffs' employers, defendants "bear the burden of proving that particular employees fit `plainly and unmistakenly within [the exemption's] terms.'" Ackerman v. Coca-Cola Enters., Inc., 179 F.3d 1260, 1264 (10th Cir.1999) (quoting Reich v. Wyoming, 993 F.2d 739, 741 (10th Cir .1993)). Defendants seek summary judgment based on the affirmative defense of the applicability of the special detail exemption. A motion for summary judgment is a proper vehicle to test an affirmative defense which entitles a defendant to judgment as a matter of law. See Hutchinson v. Pfeil, 105 F.3d 562, 564 (10th Cir.1997). "The defendant making such a motion must demonstrate that no disputed material fact exists regarding the affirmative defense asserted." Id. (citations omitted). If the defendant satisfies this burden, then the plaintiff must demonstrate with specificity the existence of a disputed material fact. See id. In making this showing, the plaintiff must "set forth specific facts that would be admissible in evidence in the event of trial." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir.1998) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." Id. The court views the evidence and all reasonable *1185 inferences therefrom in the light most favorable to plaintiff as the nonmoving party. See id. at 670. If the plaintiff fails to demonstrate the existence of a disputed material fact, "the affirmative defense bars his claim, and the defendant is then entitled to summary judgment as a matter of law." Hutchinson, 105 F.3d at 564.
A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." Adler, 144 F.3d at 670 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, in order to discern whether facts controverted by the parties are material, the court must determine what the FLSA requires for the special detail exemption to apply. The statute at issue here, 29 U.S.C. § 207(p)(1), excludes from the FLSA's overtime requirements law enforcement employees who agree to be "employed on a special detail by a separate or independent employer in ... law enforcement or related activities." Unfortunately, the statute gives little guidance as to what Congress envisioned when it used the terms "special detail" and "separate and independent."[4]
Because the pertinent terms of the special detail exemption are undefined by the statute, the court has studied Department of Labor ("DOL") regulations and opinion letters, the legislative history of the § 207(p)(1) exemption, the single legal case in which the applicability of § 207(p)(1)'s exemption has been litigated,[5] and dictionary definitions of the terms in question. These varied sources set forth a number of factors which are useful, but not determinative, in deciding whether plaintiffs fit "plainly and unmistakably" within the special detail exemption's terms. Because the circumstances of this case are unique-no other authority has examined whether this particular combination of circumstances leads to the application of the special detail exemption-the court writes on a virtual clean slate. After analyzing the teachings of these varied sources, the court ultimately finds below that questions of fact that could affect the disposition of plaintiffs' claims remain, making summary judgment inappropriate.

III. The "Special Detail" Requirement
Plaintiffs first argue that the regular and continuous nature of the Housing Authority security patrol removes the patrol from the realm of "special detail" work envisioned by the statute. Plaintiffs assert that Congress intended the exemption to apply only to unusual or isolated tasks. According to plaintiffs, the fact that the Housing Authority security patrol operates eight hours a night, five nights per week, could lead a reasonable trier of fact to find that "this is not a special detail, but a regular, ongoing operation." Defendants respond that nothing in the statute, its legislative history, implementing regulations, nor opinion letters indicate that the exemption does not apply to ongoing off-duty employment. Defendants assert that the phrase "special detail" simply applies to off-duty work performed by an employee, at his or her own option, for a separate and independent employer. Although the *1186 court believes that Congress's intent was more in line with defendants' position, it still finds that issues of material fact exist as to whether defendants meet this requirement under the meaning of the phrase "special detail" which Congress employed.
The court's starting point in construing the meaning of "special detail," as in all cases of statutory construction, is the language of the statute. See United States v. Splawn, 982 F.2d 414, 418 (10th Cir. 1992). As a general rule, where a statute is clear and unambiguous on its face, the court need not consult extrinsic sources of interpretation to determine the meaning of its terms. Fristoe v. Thompson, 144 F.3d 627, 631 (10th Cir.1998) (quoting Southern Ute Indian Tribe v. Amoco Prod. Co., 119 F.3d 816, 830 (10th Cir.1997)). 29 U.S.C. § 207(p)(1) provides that persons employed in law enforcement who also "agree[] to be employed on a special detail ... in law enforcement" are exempt from FLSA overtime requirements. The statute, however, does not define the phrase "special detail." Defendants assert that the next subsection of the statute is nonetheless instructive of the lawmaker's intent. See Smith v. United States, 508 U.S. 223, 233, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) ("Statutory construction is a holistic endeavor; [a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme.") (internal citation and quotation omitted). Section 207(p)(2) provides that if "an employee of a public agency ... undertakes, on an occasional or sporadic basis, ... part-time employment for the public agency," the FLSA overtime requirements do not apply. Defendants assert that had Congress intended to place similar frequency limitations on the § 207(p)(1) exemption, it would have used similar limiting language. While the court agrees that the language of § 207(p)(2) may imply that Congress intended "special detail" to encompass more than occasional or sporadic employment, the subsection does not go on to address the issue of "how much more?" Finding the phrase "special detail" unclear on its face and in the statutory context of § 207(p), the court will look to other sources of authority for guidance concerning its meaning.
The United States Supreme Court has held that statutory terms not defined in the statute are to be "interpreted as taking their ordinary, contemporary, common meaning." See Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). Thus, the court turns to the dictionary definitions of "special" and "detail" to determine the ordinary and common meaning of those words. See United States v. Roberts, 88 F.3d 872, 877 (10th Cir.1996) ("Because Congress did not define this term, its common and ordinary usage may be obtained by reference to a dictionary.") (abrogated on other grounds). Dictionary definitions of "special" range from "having a limited or specific function, application, or scope," see The American Heritage Dictionary 1172 (2d ed.1985), to "one outside of or in addition to the regular or normal number, quantity, series, range, or other similar category," see Webster's Third New International Dictionary 2186 (1986). As the first definition appears to support plaintiffs' position that "special" means "of limited scope," and the second definition appears to support defendants' position that "special" means "in addition to normal," these dictionary definitions do not by themselves resolve the issue. One still must determine which sense of the term "special" Congress had in mind here. Likewise, dictionaries define "detail" as "selection for a particular task," see Webster's Third New International Dictionary 616 (1986), and "the selection of one or more troops for a particular duty," see The American Heritage Dictionary 387 (2d ed.1985), but they do not address whether the duty or task must be limited to a certain frequency or time period. Because the court finds that the phrase "special detail" remains ambiguous after an examination of dictionary definitions, the *1187 court next looks to the legislative history of 29 U.S.C. § 207(p) in an attempt to determine Congress's intent in using the phrase. See Roberts, 88 F.3d at 877 ("Only if the statutory language is ambiguous should a court turn to legislative history as an aid in determining the statute's meaning.").
The Tenth Circuit has recognized that "[r]eference to the legislative history ... often will resolve uncertainties about the intent of Congress." United States v. Thompson, 941 F.2d 1074, 1077 (10th Cir. 1991). The Senate Report discussing 29 U.S.C. § 207(p) states, in relevant part:
An employee engaged in public safety is at times offered opportunities to accept optional special detail work for a separate and independent employer on the employee's off-duty time. These special details include the police officer who accepts extra employment from a school board to direct traffic at a football game, or from a promoter to furnish crowd control at a rock concert or convention.
S.Rep. No. 99-159, at 9, U.S.Code Cong. & Admin.News 1985, p. 651 (1985) (emphasis added). While the legislative history refers to one-time events, such as "a football game," it does not explicitly exclude ongoing employment. Moreover, by its very terms, the report does not purport to contain an exclusive list of examples. As the legislative history does not dispose of defendants' position that the exemption applies to continuous off-duty employment situations, the court finds it useful to examine the treatment of the special detail exemption by the DOL.
Where statutory meaning is unclear from the language of the statute and Congress has delegated the authority to interpret the statute to the agency charged with overseeing its enforcement, the court may seek guidance from any formal regulations promulgated by that agency when defining the statute's terms. See Fristoe, 144 F.3d at 631 (citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Where the formal regulations are helpful but do not end the inquiry, a court may also consult the relevant agency's informal interpretations to aid in its construction of the statute. See id. Such informal interpretations are not, however, "entitled to Chevron deference, but will instead be considered only to the extent that [they are] well-reasoned and ha[ve] `power to persuade.'" Id. See also Christensen v. Harris County, 529 U.S. 576, 120 S.Ct. 1655, 1663, 146 L.Ed.2d 621 (2000) ("[I]nterpretations contained in formats such as opinion letters are `entitled to respect' ... but only to the extent that those interpretations have the `power to persuade.'") (internal citations omitted).
The DOL regulation implementing § 207(p)(1) lists as examples of "special details" off-duty officers performing "crowd control at a parade" and working at a "convention center during concerts or sports events." See 29 C.F.R. § 553.227(e) & (g). This regulation uses the plural form of "concerts" and "events," thus indicating to the court that the DOL does contemplate that a "special detail" can include events that occur more than one time. The DOL's treatment of the special detail exemption in informal opinion letters further supports this interpretation of the regulation. The opinion letters implicitly assume that ongoing activity fits within the exemption. For example, in an opinion letter issued on April 24, 1990, discussed in detail below, the DOL administrator found that the "special detail" exemption applied to city firefighters who were continuously employed on a part-time basis by rural fire districts.
After carefully considering these varied sources of congressional intent, the court concludes that Congress only intended the phrase "special detail" to refer to a task or duty which is outside of or in addition to an employee's regular or normal duties performed for his primary employer. It did not intend to impose a frequency limitation. This definition comports *1188 with the legislative history, regulations, DOL opinion letters, and "occasional or sporadic" language which is used in § 207(p)(2) but not in § 207(p)(1). Thus, a "special detail" need not be limited in scope to an "occasional or sporadic" function, yet a "special detail" must go beyond an employee's normal job duties. Congress intended to permit a special detail to involve doing the same kind of work, such as law enforcement, but it did not intend to permit simply doing work for the primary employer under a different guise.
Under this definition, material facts speaking to whether plaintiffs fit "plainly and unmistakably" within the "special detail" language of the exemption remain in dispute. They revolve around the extent to which plaintiffs perform duties outside of or in addition to their regular KCKPD duties while working the Housing Authority patrol. Plaintiffs maintain that they are essentially just doing ordinary work for their primary employer, the Unified Government. Defendants contend to the contrary. While there is evidence that Housing Authority officers perform some services not performed by KCKPD police officers, such as enforcing the Housing Authority no-trespassing policies and lease provisions, factual issues remain, such as what proportion of a Housing Authority officer's time is spent performing such additional functions as compared to what proportion of his or her time is spent simply performing the regular, or "baseline," service of the KCKPD.
For example, a question relevant to this issue is whether Housing Authority officers regularly respond to routine calls for service, such as 911 calls for assistance that originate from Housing Authority complexes. The facts are in dispute. The Kansas City, Kansas Housing Authority Security Officer Scope and Control Agreement (Pl.Exh.8) states that Housing Authority officers must go "in service" with the KCKPD dispatcher during their shift at the Housing Authority. While the Agreement does not specifically contemplate the Housing Authority officers being directly dispatched to calls within Housing Authority complexes, it does advise that "security officers should investigate any call that on-duty officers are dispatched to in Housing Authority complexes," and that if "security officers are not already engaged in some sort of activity or already on a call, they should volunteer to handle the call." A memorandum issued on August 26, 1998 by the Housing Authority Security Program Coordinator, Sergeant Dennis Worley, to Housing Authority officers appears consistent with the Agreement. The memorandum states, "We are not expected to respond to police calls for service, however you are expected to fulfill your primary objective of patrolling Housing Authority property." Sergeant Worley testified at his deposition that he directs Housing Authority officers to respond to calls for service in Housing Authority complexes if they are not "tied up doing something else." On the other hand, Sergeant Worley stated that on-duty KCKPD officers are dispatched to all Housing Authority calls, other than "report calls."[6] A number of plaintiffs have also testified in affidavits and during depositions that they are dispatched to calls originating from Housing Authority complexes while on Housing Authority patrol. Plaintiff David Kearney testified that the Unified Government dispatches Housing Authority security officers to calls received from Housing Authority properties. Plaintiffs Michael Hughes, Chad Cowher, and Alexander Kump each prepared individual affidavits in which each swears that "I have been instructed by Sgt. Dennis Worley, of the Kansas City, Kansas Police Department, that I am to respond to calls for service from the police dispatcher at any of the Housing Authority properties if I am working as a Housing Authority officer." Plaintiffs Cower and Kump further swear *1189 that KCKPD sergeants and commanders expect Housing Authority officers to handle all calls for service in the Housing Authority properties. Likewise, Plaintiff Hughes, who works for the KCKPD dispatch unit, stated that, "[r]outinely, dispatchers would automatically dispatch Housing Authority officers who are in service." Finally, Police Chief James Swafford conceded during his deposition that Housing Authority officers are dispatched to calls within the Housing Authority complexes if the on-duty KCKPD officers are back-logged with calls.
A second fact question exists as to the extent to which on-duty Housing Authority security officers perform police work at non-Housing Authority properties. The Kansas City, Kansas Housing Authority Security Officer Scope and Control Agreement (Pl.Exh.8) advises Housing Authority officers to "assist in the investigation" of "part 1 crimes against persons," such as rape or homicide, that they become aware of, even if the crimes did not occur on Housing Authority property. Similarly, Plaintiff Kearney testified at his deposition that he has been dispatched to respond to non-Housing Authority calls while working Housing Authority patrol. Neither the Agreement, nor Officer Kearney, however, elaborated on whether such non-Housing Authority work by Housing Authority officers was a frequent occurrence, nor on the circumstances that surround the performance of such work.
Moreover, a fact issue remains as to whether on-duty KCKPD officers perform fewer services at Housing Authority complexes when Housing Authority officers are on duty than when Housing Authority officers are not on duty. Evidence that KCKPD officers perform fewer services while Housing Authority officers are on duty would suggest that Housing Authority officers are performing tasks normally performed by KCKPD officers. Plaintiff Cowher stated in his affidavit that "Housing Authority officers are a substitution for regular police services at the Housing Authority properties." In contrast, Chief Miller and Major Culp each testified that the services provided by on-duty KCKPD officers remain at "normal levels" when Housing Authority officers are on duty. Plaintiffs Johnson and Kearney supported this testimony in their depositions, stating that the Police Department offers Housing Authority residents the same police services that it offers to other residents of the City of Kansas City, Kansas. Moreover, when the Housing Authority security patrol program was temporarily halted in late 1998 because the Housing Authority ran out of HUD funds to pay security patrol officers, the KCKPD alone provided police service to Housing Authority residents.
These factual issues would allow a reasonable trier of fact to find for either party on the issue of whether the Housing Authority patrol falls within the definition of a "special detail." As genuine issues of material fact remain, summary judgment based on this requirement is improper.

IV. The "Separate and Independent" Requirement
Summary judgment is further inappropriate because genuine issues of material fact exist as to whether the Housing Authority and the Unified Government are "separate and independent" entities. As discussed by the court in its February 17, 2000 Memorandum and Order, there is no hard-and-fast test for determining whether two employers are separate and independent. Indeed, both the statute and the DOL regulation are silent as to what factors are to be considered in the assessment of whether two employers fall within the meaning of this phrase. According to the implementing regulation, "whether two employers are, in fact, separate and independent can only be determined on a case-by-case basis." 29 C.F.R. § 553.227(c). The court has previously noted some of the factors that opinion letters issued by the DOL have considered when addressing whether two employers are separate and *1190 independent. See Barajas, 87 F.Supp.2d at 1208-09. These factors include whether the two employers are treated as separate employers by governmental agencies for payroll purposes, whether the two employers maintain separate benefits and retirement systems, the amount of control the primary employer exerts over the budget and finances of the secondary employer, and the legal relationship between the two employers. Other opinion letters examined by the court also consider the job duties performed by the employee while on duty for the secondary employer and the amount of control the first employer exercises over such job duties. While the uncontroverted facts clearly demonstrate that the Housing Authority and Unified Government are treated separately for payroll purposes[7] and maintain separate personnel policies and benefits systems,[8] the court finds that fact questions prevent the court from making a final determination as to the remaining factors. Moreover, because the question must be answered on a "case-by-case" basis, how all the factors might be evaluated in combination simply cannot be determined on the record before the court.

 The Extent to Which the Unified Government Controls the Job Duties of Housing Authority Officers
The amount of control that the Unified Government exercises over the job duties of the Housing Authority officers is the first factor which the court deems important to weigh in determining whether the Housing Authority and Unified Government are separate and independent under the § 207(p)(1) exemption. Plaintiffs take the position that the Police Department exercises "substantial control" over the Housing Authority security officers and uses the Housing Authority security officers to supplant baseline KCKPD service to the point that "a jury could find that Plaintiffs were at all times herein working for the Unified Government's Police Department." Defendants respond that § 207(p)(1) allows the Police Department to facilitate and effect the employment of the security officers, and that the services provided by the housing authority security patrol are in addition to the baseline services provided by on-duty KCKPD officers.
Defendants are correct in noting that the special detail exemption specifically provides that a primary employer may "facilitate [] the employment of such employees by a separate and independent employer ... or ... otherwise affect [] the condition of employment of such employees by a separate and independent employer" without losing the benefits of the exemption. 29 U.S.C. § 207(p)(1)(B) & (C). The interpretive DOL regulation provides examples of ways in which a police department may "facilitate" employees' off-duty employment. A police department may:
 maintain a roster of officers who wish to perform off-duty law enforcement work and select the officers for off-duty work from that roster,
 negotiate the pay that the officers will receive for their off-duty employment,
 retain a fee for the administrative expenses relating to the off-duty employment,
 require that the secondary employer pay the fee for such law enforcement services directly to the police department and establish procedures for officers to receive their pay for off-duty *1191 work through the police department's payroll system, and
 require that the officers observe their normal standards of conduct during their off duty work and take disciplinary action against those who fail to do so.
29 C.F.R. § 553.227(d).[9]
On the other hand, it appears clear that there is a distinction between "facilitating" or "affecting" the employees' off-duty employment and "controlling" the employees' off-duty employment to the extent that the off-duty employment is used to supplant the service ordinarily provided by the primary employer.[10] In an opinion letter issued on March 18, 1993, the DOL held that where a secondary employer's principal purpose is to provide the same services ordinarily performed by the primary employer, the "integrated structure" of the two employers prevented a finding that they were separate and independent under the special detail exemption. 1993 WL 895017. The opinion letter described a situation in which a County was responsible for providing emergency medical and rescue services (EMS services) within its jurisdiction. The County entered into a contract with a private non-profit corporation called Ogden. The contract required that Ogden provide EMS services within a defined area of the County, provide backup EMS assistance whenever dispatched to do so by the County, and provide all of the County's EMS service on nights and weekends. Certain County EMS employees who volunteered their services to Ogden sought to have their volunteer hours included in determining whether they were entitled to overtime hours for the purpose of the FLSA. The DOL concluded that Ogden was not separate and independent of the County because Ogden's "principal purpose is to provide the same services for the County, through the use of `volunteers,' which regular employees of the County otherwise provide." The "integrated structure of the County's EMS services" precluded application of the special detail exemption.
The court does not conclude from the March 18, 1993 opinion letter, however, that the DOL has taken the position that whenever a primary employer contracts with a secondary employer to perform the *1192 work ordinarily done by the primary employer the two employers are absolutely precluded from being found separate and independent. Indeed, a second opinion letter issued by the DOL on April 24, 1990 found that a City could contract with rural fire districts to provide fire coverage to specific geographic areas within the City limits without losing the § 207(p)(1) exemption for firefighters who were employed by both the City and the contracted rural fire districts. The application of the exemption is decided on a case-by-case basis and it is likely that in the Ogden EMS case the DOL was influenced by the fact that Ogden was so closely connected with the County. The County completely controlled the activities of Ogden's volunteers via the fact that Ogden would not exist if the County stopped contracting out its EMS work to Ogden. Moreover, the County alone determined when Ogden volunteers were dispatched to provide backup assistance to the County, and Ogden followed the County's order. In contrast, in the firefighter case it is clear that the existence of the rural fire districts did not depend on continued contracts entered into with the City. The City and the rural fire districts were hierarchically separate (one was not the agent of the other), and one did not exist solely to do the work of the other. Additionally, there is no indication that the City dispatched the employees of the rural fire districts or controlled their actions in any other way.
Further guidance on the distinction between "facilitation" and "control" is found in the only court case which addresses the special detail exemption, Crow v. Derby, No. 91-1267-PFK, 1992 WL 363682 (D.Kan. Nov.13, 1992).[11] In Crow, a police officer was primarily employed by the City of Derby, but performed undercover narcotics work for Sumner County and Cloud County through an "officer trading" program that those counties had with the City of Derby. As part of his undercover work, the officer was employed in non-police jobs, such as construction work. The officer sought to have the hours spent working in the non-police jobs attributed to the City of Derby for purposes of calculating his entitlement to overtime under the FLSA. In determining that the officer was entitled to overtime, the court found the § 207(p)(1) exemption inapplicable based on its finding that the officer's work for the non-police employer "was not during his off-duty hours, because he was technically always working for the Cloud, Sumner, or Derby Police Departments." Id. at *2. The court stated that "the facts of this case suggest nothing separate or independent about plaintiff's work [as] the Derby Police Department apparently retained the power to fire plaintiff and to determine his work assignments." Id. at *3. The amount of control that the officer's primary employer retained over the officer's work for his secondary employer was a determinative factor in the Crow court's finding that the two employers were not separate and independent.
In this case, the facts are in dispute as to whether the KCKPD controls the activities of the Housing Authority officers, or simply facilitates and affects their Housing Authority employment. As discussed under the "special detail" analysis above, fact questions remain as to whether on-duty Housing Authority officers supplant the work of the KCKPD. These factual questions are also pertinent to the "separate and independent" analysis because, as the two DOL opinion letters suggest, whether the primary employer uses employees of the secondary employer to perform the primary employer's work is intrinsically interwined with the question of whether *1193 the two employers are separate and independent or whether one controls the other.
A related factual issue in dispute is the role that the KCKPD plays relating to plaintiffs' Housing Authority duties, including the amount of supervision and direction that on-duty KCKPD sergeants provide Housing Authority officers. On April 5, 1999, Sergeant Worley issued a memorandum to all Housing Authority officers entitled "Span of Control." The memorandum advised the Housing Authority officers to check-in with the Police Department supervisor at the start of each Housing Authority shift so that they may be advised of any situation that the supervisor would like them "to handle regarding Housing Authority property." The memorandum concluded by saying that Housing Authority officers "are under the direction of the police department" and "are accountable to the police department and are under their span of control." It is not disputed that Housing Authority officers must follow instructions given to them by supervisors at the KCKPD, but factual questions remain as to how often supervisors actually exerted control by issuing orders to the Housing Authority officers. Defendants assert that all KCKPD officers, not just Housing Authority officers, are required to follow orders given by their superiors. Plaintiffs Cowher and Kump, however, have affirmed that they are supervised more closely by KCKPD supervisors while working for the Housing Authority than while performing other off-duty security jobs.
The court believes that a reasonable trier of fact could determine, based on the evidence currently before the court viewed in the light most favorable to plaintiffs, that the job duties of the Housing Authority officers and the actions of the Police Department demonstrate that the Unified Government controls and does not just facilitate or affect plaintiffs' employment with the Housing Authority. Thus, this factor, which the court has determined to be an important factor to weigh in determining whether the Housing Authority and Unified Government are "separate and independent," remains unresolved.

B. The Extent of the Unified Government's Financial Control over the Housing Authority Security Program
Factual issues also preclude the court from reaching a conclusion on the financial control factor of separate and independentness. In its first order denying summary judgment, the court determined that the extent to which the Unified Government controls or finances the operating functions of the Housing Authority is an important factor in determining whether the two entities are separate and independent. See Barajas, 87 F.Supp.2d at 1209. Finding "no evidence with respect to the extent of control, if any, defendant Unified Government exercises with respect to the Housing Authority's budget, and the extent to which, if at all, the Housing Authority's operating functions are financed by the Unified Government," the court denied summary judgment. The parties agreed at the December 8, 2000 Motion Hearing that it is factually undisputed that the Unified Government provides no monetary funds to the Housing Authority. There remain, however, disputed factual questions involving the value and importance of in kind contributions provided by the Unified Government to the Housing Authority, as well as factual questions involving the amount of control the Unified Government exercises over the Housing Authority's ability to obtain Department of Housing and Urban Development ("HUD") funding. These factual questions are material to whether the Housing Authority is truly independent of the Unified Government in light of whatever ability the Unified Government may have to control the activities of the Housing Authority by making or withholding in kind contributions or by giving or withholding its support for grant applications. The factual questions are also material to whether the support the *1194 Unified Government provides goes beyond mere "facilitating" and "affecting" employment.
It is not disputed that the Unified Government, through the KCKPD, provides a number of in kind services to the Housing Authority which aid in the functioning of the Housing Authority security program. Until October 1999, the KCKPD provided two high-mileage (over 150,000 miles) marked patrol cars, which had been removed from regular-duty use, to the Housing Authority for use by the security patrol officers.[12] While the Housing Authority reimbursed the Unified Government for the gasoline used by these vehicles, the Housing Authority did not reimburse the Unified Government for insurance maintained on the vehicles, nor for maintenance done on the vehicles. The KCKPD further provides two portable hand-held radios (in addition to the radios in the patrol cars) to the Housing Authority. Via these radios, the security patrol officers are connected with the KCKPD dispatch service. The National Crime Information Center ("NCIC") criminal database is also available to the Housing Authority patrol officers, just as it is available to any off-duty officer via a land-line. When documenting criminal activity at the Housing Authority, Housing Authority patrol officers do so on forms provided by the KCKPD. The KCKPD also permits Sergeant Worley to perform some of his Housing Authority duties while on-duty with the Police Department, even though it is against the general policy of the KCKPD for officers to undertake off-duty employment activities while on-duty.
While the evidence in the record supports the presence of these in kind contributions, it does not speak to the value of such contributions. Defendants assert that the value of the in kind contributions is de minimis, yet defendants present no evidence in support of their argument. In fact, there is evidence in the record from which a reasonable trier of fact could find that the in kind contributions are of substantial importance to the Housing Authority. While he did not place a specific value on the contributions, Sergeant Worley did testify during his deposition that if the "equipment, paper work, forms, and all the financial or material assistance" were not provided by the Unified Government, the Housing Authority security program could not operate as it currently does.
Factual issues also exist regarding the amount of control the Unified Government exercises over the Housing Authority's ability to obtain the HUD grant money that is undisputedly the sole source of funding of the Housing Authority security program. Since 1992, the Housing Authority has received grants through a HUD program entitled the "Public Housing Drug Elimination Program" ("PHDEP"). HUD regulations implementing the PHDEP prescribe that "[g]rantees must provide HUD with evidence of partnerships-in particular, firm commitments by organizations providing funding, services, or other in-kind resources for PHDEP-funded activities (e.g., memorandum of agreement, letter of firm commitment)." 24 C.F.R. § 761.23(a)(4). The regulations further state that "[e]ach grantee must consult with local law enforcement entities in the preparation of its plan for addressing the problem of drug-related and violent crime under § 761.21 and must maintain documentation of such consultation." 24 C.F.R. § 7761.23(b)(2). Thomas Stibal, the Executive Director of the Housing Authority, testified during his deposition that he understands these regulations to impose a requirement that each application for a PHDEP grant include a certification of approval signed by the chief executive officer of the governmental jurisdiction providing police services and a certification *1195 of approval signed by a representative of the local law enforcement agency. Indeed, the Housing Authority has included such certifications of approval signed by the KCKPD Chief of Police and Unified Government Administrator in its past PHDEP grant applications. Material questions of fact remain unresolved concerning whether or not the Housing Authority would be awarded grant money to fund the security patrol program absent the approval of agents of the Unified Government and the extent to which any such leverage is inconsistent with the Housing Authority actually being independent from the Unified Government.

C. The Legal Relationship of the Two Employers
The final factor which the court deems important to weigh in making a determination of whether the Housing Authority and Unified Government are separate and independent is the legal relationship of the two defendants. The basic facts surrounding the defendants' relationship are generally undisputed. Yet, because a determination of whether two employers are separate and independent can only be made on a case-by-case basis, see 29 C.F.R. § 553.227(c), the weight these facts should be given cannot be fully assessed at this stage. Thus, the court will simply set forth here the undisputed facts that speak to the legal relationship of the defendants and note that, at the summary judgment stage, "all reasonable inferences" from these facts must be viewed in the light most favorable to plaintiffs as the nonmoving party. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).
Pursuant to K.S.A. § 17-2340, Kansas municipalities are empowered to create, as an agent of the municipality, "an authority to be known as the `housing authority' of the municipality." K.S.A § 17-2340. That section further provides that:
[t]he municipality may delegate to such authority any or all of the powers conferred on the municipality by this act, and may authorize it to employ an executive director, technical experts and such other officers, agents and employees, permanent and temporary, as it may require, and to delegate to one or more of its agents or employees such powers or duties as the authority may deem proper. Such housing authority shall have the power to sue and be sued.
K.S.A. § 17-2340. On August 6, 1957, the City of Kansas City, Kansas adopted Resolution Numbers 15872 and 15873, whereby the "Housing Authority of Kansas City, Kansas" was created.[13] In furtherance of the purpose of the Housing Authority, the City passed a resolution, delegating to the Housing Authority "[a]ll the powers conferred upon the City of Kansas City, Kansas."[14] Resolution No. 15872. While it is *1196 clear that the Housing Authority is an agent of the Unified Government, the Census of Government classifies housing authorities created by cities in Kansas as separate governmental entities. See Census of Government Summary, Doc. 70, Exh. 10.
The Housing Authority has an oversight Board of Commissioners ("Housing Authority Board"), which consists of members appointed by the Mayor of the Unified Government ("Mayor"), Commissioners of the Unified Government, and residents of Housing Authority complexes. The Housing Authority Board has the responsibility of making decisions on behalf of the Housing Authority, and of selecting and employing an Executive Director to oversee the daily functioning of the Housing Authority. Each of the current Unified Government Commissioners who serve on the Housing Authority Board has testified that he or she has never been instructed by any agent of the Unified Government on how he or she should vote, nor instructed on the action that he or she should take on behalf of the Housing Authority.[15] Each Commissioner further affirmed that he or she acts solely by making decisions which he or she believes to be in the best interests of the Housing Authority, even if those interests coincide with the best interests of the Unified Government. K.S.A. § 17-2343 provides, however, that the Mayor or Board of County Commissioners may remove a Commissioner of the Housing Authority Board "[f]or inefficiency or neglect of duty or misconduct in office ... after a hearing and after he shall have been given a copy of the charges at least ten (10) days prior to the hearing and had an opportunity to be heard in person or by counsel." Although the Unified Government's Board of County Commissioners has never removed a Housing Authority Commissioner in the past, it has occasionally declined to re-appoint a Housing Authority Commissioner at the end of his or her term.[16]
While certain of these enumerated facts support defendants' argument that they are separate and independent, the fact that the Housing Authority was created by the Unified Government and especially the fact that the Unified Government appoints and has the power to remove two-thirds of the members of the Housing Authority board suggest that there may be an ability to control the Housing Authority which is inconsistent with actual independence. On the record before the court, it is clear that these facts do not show "plainly and unmistakably" that the two entities are separate and independent.

V. Conclusion
Because there remain disputed questions of material fact, defendants' motions for summary judgment must be denied. The court must, then, reset the matter for a final pretrial conference. It does so before United States Magistrate Judge David J. Waxse with directions that he also pursue efforts to assist the parties in arriving at a mutually agreeable settlement to this dispute. If there is to be a trial in this case, the Magistrate Judge will address any remaining damage-related discovery *1197 issues (liability-related discovery having closed).[17] The parties shall be prepared to address the issue of bifurcating this case into a liability phase and a damages phase for trial purposes.
IT IS THEREFORE ORDERED BY THE COURT THAT defendant Housing Authority's motion for summary judgment (Doc. 69) and defendant Unified Government's motion for summary judgment (Doc. 78) are denied.
IT IS FURTHER ORDERED BY THE COURT THAT the Final Pretrial Conference, previously scheduled for December 18, 2000, is rescheduled for January 19, 2000 at 1:00 p.m. before the Honorable David J. Waxse, United States Magistrate Judge, to whom all further pretrial matters are hereby referred for disposition. The parties' proposed jointly prepared pretrial order shall be submitted to Judge Waxse no later than January 12, 2000.
IT IS SO ORDERED.
NOTES
[1] Only the facts necessary for a general understanding of the case are presented here. Additional facts are discussed below as they become relevant.
[2] As discussed in the court's February 17, 2000 Memorandum and Order, section 207(a) of the FLSA requires employers to pay their employees overtime compensation, at a rate of one and a half times their regular hourly wage, for each hour worked in excess of forty hours per week. 29 U.S.C. § 207(a). Section 207(k) of the statute alters the hourly threshold at which overtime compensation is triggered for certain types of public agency employees; law enforcement personnel must accumulate forty-three hours per week before they are entitled to overtime compensation. 29 U.S.C. § 207(k); 29 C.F.R. § 553.230(c).
[3] The Unified Government and the Housing Authority move for summary judgment on the same ground, asserting essentially the same arguments and statements of uncontroverted facts. In fact, the two defendants filed a joint reply to plaintiffs' statement of controverted facts, and the Unified Government "incorporat[ed] by reference the arguments and authorities set forth in defendant Housing Authority's reply" brief. The defendants obviously recognize that if one is entitled to summary judgment based on the special detail exemption, so too is the other entitled to summary judgment. Therefore, the court generally will not differentiate between the Housing Authority's arguments and the Unified Government's arguments, and will refer instead to "defendants'" arguments.
[4] As discussed in the court's first order, the text of the statute uses the separate/independent terminology five times to describe the relationship between the primary and secondary employer. 29 U.S.C. § 207(p)(1). The first time that those words appear in the statute, they are connected by the conjunction "or;" however, at all other times that those words appear in the statute, they are connected by the conjunction "and." Id. Despite the above-noted use of the term "or" in the statute, the remaining statutory text, the legislative history of the section, the implementing federal regulations, and the DOL opinion letters discussing the section all refer to the "separate/independent" terminology in the conjunctive. In light of the fact that the defendant has no objection and the court has not found any authority for the proposition that there is any substantive significance to the apparent inconsistency, the court will likewise refer to the "separate/ independent" employer requirement in the conjunctive.
[5] See Crow v. City of Derby, Kansas, 1992 WL 363682 (D.Kan. Nov.13, 1992).
[6] Sergeant Worley defined a "report call" as "a call that somebody wants to report that their child's bicycle has been stolen or somebody broke a window in my unit."
[7] Both the United States Department of Treasury and the State of Kansas have given the Housing Authority an employer identification number separate from the Unified Government's employer identification number.
[8] It is uncontroverted that the Housing Authority and Unified Government maintain separate personnel policies, workers' compensation insurance, and group health insurance. As entities of the state of Kansas, however, both employers participate in the Kansas Public Employees' Retirement System (KPERS).
[9] 29 C.F.R. § 553.227(f) provides that the principles in these examples "are exemptions to the usual rules on joint employment set forth in part 791 of this title." The joint employment rules referred to, 29 C.F.R. § 791.2, mandate that "where [an] employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as ... where the employers are not completely disassociated with respect to the employment of a particular employee...." Plaintiffs concede, and the court agrees, that if the Unified Government was doing nothing more than "facilitating" the special detail employment of the Housing Authority officers (as opposed to "controlling" the employment of the Housing Authority officers), such that the Housing Authority and the Unified Government remain separate and independent, then the joint employment provisions do not apply in this case. The special detail exemption would apply to exempt defendants from the usual rules of joint employment. See S.Rep. No. 99-159, at 9 (1985) ("Under [29 U.S.C. § 207(p)(1)], the joint employment rule would not apply so long as (i) the special detail is worked solely at the employee's option; (ii) the two employers are in fact separate and independent; and (iii) the primary employer requires, facilitates, or affects the performance of the work.").
[10] Plaintiffs refer to such a situation as one in which the primary employer is actually providing the "direct employment" of the employees. While plaintiffs assert a "direct employment" theory of entitlement to overtime under the FLSA separate from their theory that the Housing Authority and the Unified Government are not separate and independent entities under the special detail exemption, the court follows the lead of the authorities cited below and merges the two theories. The authorities suggest that the amount of control the primary employer exercises over the job duties of the employees who are technically working for the secondary employer is a factor to be considered when determining whether the two employers are separate and independent.
[11] The court does not consider the recent case of Cahill v. New Brunswick, 99 F.Supp.2d 464 (D.N.J.2000) applicable to this issue. While the New Jersey District Court determined that law enforcement officers who voluntarily performed "extra-duty" assignments were employees of the City, rather than independent contractors, there is no indication that the court was asked to consider the effect that the special detail exemption would have had on its decision.
[12] Since October 1999, the Housing Authority has provided its own vehicles for the patrol officers' use. The KCKPD occasionally uses these Housing Authority vehicles when performing under-cover police operations.
[13] Those resolutions were recreated by Ordinance Numbers 64614 and 64615, which were enacted on March 1, 1984. On June 4, 1998, Resolution Numbers 15872 and 15783, recreated as Ordinance Numbers 64614 and 64615, were amended by Ordinance Numbers O-31-98 and O-70-99 to reflect the consolidation of the City of Kansas City, Kansas with Wyandotte County in the form of the Unified Government.
[14] A number of statutes give the Housing Authority the power to perform all of the acts necessary for its function. First, it is clear from K.S.A. § 17-2340 and Resolution 15872 that the Housing Authority has the power to sue and be sued. In fact, the Housing Authority has been sued in the past by a former employee in a lawsuit in which the Unified Government was not named as a defendant. Second, the Housing Authority has the power to issue bonds, see Resolution 15872, and Mr. Stibal testified that the construction of the original Housing Authority complexes was financed by bonds issued by the Housing Authority. Third, the Housing Authority may lease, purchase, and sell property without the consent of the Unified Government. See K.S.A. § 17-2345(d). When it does sell property, it retains the proceeds of the sale without accounting to the Unified Government. Finally, the Housing Authority is empowered to employ its own staff and to determine their qualifications, duties, and compensation. See Resolution 15872.
[15] Plaintiffs object to the affidavits of the Commissioners on the ground that they "constitute and contain" hearsay. At the summary judgment stage, the evidence produced by the parties need not be "in a form that would be admissible at trial ... but the content or substance of the evidence must be admissible." Thomas v. International Business Machs., 48 F.3d 478, 485 (10th Cir. 1995). The court does not agree that the substance of the affidavits contain hearsay. The Commissioners' testimony that a statement was not made is offered to show the lack of an action, not to show the truth of a statement.
[16] Housing Authority Commissioners serve four year terms. See K.S.A. § 17-2341. There is no evidence on the record as to the Unified Government's reasons for not re-appointing particular Housing Authority Board Commissioners.
[17] No additional dispositive motions are contemplated.